Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 5414 | DATE | March 24, 2004 |
| CASE TITLE | Jason Rorzskowiask  v  Village of Arlington Heights, et al | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Hearing
(5) ☐ Status hearing
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is

(10) ■ [Other docket entry]  Memorandum opinion and order entered. Accordingly, defendants' motion for summary judgment is granted in its entirety.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| X | Notices mailed by judge's staff. | | MAR 2 6 2004 | |
| | Notified counsel by telephone. | | date docketed | 63 |
| | Docketing to mail notices. | | Docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |
| GDS | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JASON ROZSKOWIAK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 01 C 5414 |
| v. | ) |
| | ) Judge Robert W. Gettleman |
| VILLAGE OF ARLINGTON HEIGHTS, an Illinois Municipal corporation; VILLAGE OF ARLINGTON HEIGHTS BOARD OF FIRE AND POLICE COMMISSIONERS AND ITS INDIVIDUAL MEMBERS, both in their individual capacities and in their official capacities; RODNEY KATH, both in his individual capacity and in his capacity as Chief of Police of the Village of Arlington Heights Police Department; RONALD E. McCLASKEY, both in his individual capacity and in his capacity as Deputy Chief of Police of the Village of Arlington Heights Police Department; PETER D. KINSEY, both in his individual capacity and in his capacity as a Supervisor for the Village Arlington Heights Police Department; SGT. WILLIAM C. MARTIN, both in his individual capacity and in his capacity as a Supervisor for the Village of Arlington Heights Police Department; and SGT. WILLIAM NEWMAN, both in his individual capacity and in his capacity as a Supervisor for the Village of Arlington Heights Police Department, | ) |
| Defendants. | ) |

**<u>MEMORANDUM OPINION AND ORDER</u>**

In his first amended, seven-count complaint, plaintiff Jason Rozskowiak seeks damages against defendants arising from their alleged discrimination against him on the basis of national origin during and subsequent to his employment with the Village of Arlington Heights Police Department. Specifically, plaintiff's claims are as follows: hostile work environment in violation



of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000 et seq., against defendants Village of Arlington Heights (the "Village"), Rodney Kath, Ronald McClaskey, Peter Kinsey, William Martin, and William Newman (Count I); termination on the basis of plaintiff's national origin in violation of Title VII against defendant Village of Arlington Heights Board of Fire and Police Commissioners and its individual members (the "Board of Commissioners"), the Village, Kath, McClaskey, Kinsey, Martin and Newman (Count II); damages under 42 U.S.C. §§ 1981 and 1981(a) against all defendants (Count III); violation of the Labor-Management Relations Act (the "LMRA"), 29 U.S.C. § 158(a)(1), against the Village and Board of Commissioners (Count IV); intentional interference with an employment relationship under Illinois law against Kath, McClaskey, Kinsey, and Martin (Count V); intentional interference with a prospective business advantage under Illinois law against the Village and Kath (Count VI); and "defamation and false light invasion of privacy" under Illinois law against Kath (Count VII).

Defendants have moved for summary judgment on all counts pursuant to Fed. R. Civ. P. 56. For the reasons stated herein, defendants' motion is granted in its entirety.

## FACTS[1]

Plaintiff was hired as a probationary officer by the Village on October 8, 1998. He was sent to the Illinois State Police Basic Recruits School and after graduation was placed in a fourteen-week field training program. Upon completion of the fourteen-week program, plaintiff was released for "solo patrol."

---

[1]Unless otherwise noted, the following facts, taken from the parties' L. R. 56.1 Statements and attached exhibits, are not in dispute.

On May 15, 1999, while on solo patrol, plaintiff arrested Harvey Olson for driving without a license on his person and speeding. Olson subsequently filed a citizen complaint[2] with the Village in which he stated that plaintiff used "Gestapo-like tactics" and used undue force during his encounter with Olson. Among other things, Olson complained that plaintiff instructed him that he could say only "yes, sir," and "no, sir" and was "abusive with the use of his power" over both Olson and Olson's wife.

All citizen complaints are investigated, and Deputy Chief of Police Ronald McClaskey assigned Sergeants William Martin and Kenneth Galinski to investigate the Olson complaint. On May 28, 1999, Sergeants Martin and Galinski interviewed plaintiff regarding the Olson incident and subsequently filed a report summarizing their investigation.

At his deposition, Martin testified that he concluded that plaintiff "overreacted to a traffic stop in which he was confused about a charge of driving without a driver's license [on the person] and the charge of driving with no valid driver's license." According to Martin, after pulling Olson over for speeding, plaintiff handcuffed Olson and brought him to the police station thinking that the proper charge was driving without a valid license, which is a custodial offense. Ultimately, however, plaintiff charged Olson with driving without a driver's license on his person, which Martin characterized as a "minor traffic violation."

According to Martin, the speeding violation committed by Olson did not require a custodial arrest, unless Olson "[did not] have a driver's license or [could not] prove that [he had] a valid driver's license." According to Martin, plaintiff explained in his interview that he was

---

[2]Olson's complaint, although not attached to defendants' L. R. 56.1 statement, was attached to defendants' answer to plaintiff's first amended complaint.

confused between the charges of driving without a driver's license on the person and driving without a valid driver's license. Martin testified that, although plaintiff's confusion was not uncommon, the recommended course of action in such a situation would be to call a supervisor, which plaintiff failed to do.

In light of the Olson complaint and Martin's and Galinksi's investigation thereof, on June 15, 1999, Chief of Police Rodney Kath inquired of the Command Staff whether he should dismiss plaintiff immediately or invest more time in retraining plaintiff, and the staff recommended the latter. Sergeant William Newman, who was not a field training officer, was assigned to ride along with plaintiff for the purpose of providing additional training.

According to Commander Peter Kinsey's deposition testimony, the Command Staff determined that the field training program had failed plaintiff and thus it would be inappropriate to put plaintiff back into field training. Before the meeting, Sergeant Newman, who had previously spoken with Commander Peter Kinsey regarding plaintiff's performance deficiencies, volunteered to do the additional training, and the Command Staff assigned the task to him (even though he was not a field training officer). In his affidavit, plaintiff asserts that Sergeant Newman was assigned to ride-along with him either to document reasons justifying plaintiff's termination or to force him to resign.

Between June 17, 1999, and July 12, 1999, Sergeant Newman spent thirteen work days, totaling approximately 90 to 100 hours, directly observing plaintiff. Sergeant Newman completed typewritten daily reports of his observations which plaintiff signed. In his affidavit, plaintiff asserts that, based on a conversation in which Commander Kinsey informed him that Sergeant Newman would make a decision on whether or not plaintiff would continue to work for the

4

police department, plaintiff understood that "Sergeant Newman was chosen to ride along with [me] for the reason of getting me terminated." Newman was never asked for any recommendation with respect to discipline or termination of plaintiff, however.

According to plaintiff, Sergeant Newman made derogatory remarks about plaintiff's Polish national origin, calling him a "stupid Polack" and a "dumb Polack," among other things, during the thirteen-day ride along. Sergeant Newman denies plaintiff's characterization of his remarks. Rather, at his deposition, Sergeant Newman testified:

> Well, [plaintiff] would make a specific comment, he would say – he would raise his hands and put a smile on his face and he'd say, "What do you expect? I'm Polish," when confronted with a problem or some type of criticism, and he would do that several times a day.... And after several days of observing that, when he would start to put his hands up on several occasions, as he would start to say that, I would say, "Yes, I know, you're Polish. Let's move on," and I would move on in our conversation.

Sergeant Galinski testified at his deposition that every time he would point out necessary corrections in plaintiff's police reports, plaintiff would say, "Come on, what do you expect from a Polack." Another officer, Sergeant Raymond Rohde, stated in an affidavit that when plaintiff would make a mistake and it was called to his attention, plaintiff would "cock his head to one side with a big smile and say 'It's because I am a Polack.'" According to Rohde, he told plaintiff to stop making comments about his Polish identity, which were an insult to the Polish nationality and made him look foolish. Plaintiff disputes Rohde's characterization of their conversation, and denies making derogatory comments about himself as an excuse for his mistakes.

At one point in his deposition, plaintiff testified that he did not recall anyone else in the police department ever making any derogatory remarks about his Polish ancestry; at later point, however, he testified that Sergeant Martin called him a "stupid Polack" during his investigation

5

of the Olson incident and that Commander Kinsey made comments to the effect of "You're not cut out [to be a police officer] because you are Polish."

The parties also dispute whether plaintiff was told that he needed higher quotas for tickets and driving under the influence arrests. Although plaintiff testified at his deposition that no one told him that he had to have higher quotas, he did state that he was expected to have higher statistics than other probationary officers, and that he believed he had to have higher quotas because of his Polish extraction. Plaintiff did not produce evidence regarding the statistics for other probationary officers relating to their arrests or productivity, however.

At his deposition, plaintiff testified that he could not recall any other ethnic slurs directed at him after he completed his tour with Sergeant Newman. In his affidavit, however, plaintiff stated that, after he completed his tour, "on almost a daily basis, Sergeant Newman would call me in from patrol to tell me personally that the written evaluations he made of me during my training were handed over to Deputy Chief Ronald McClaskey and that I would be terminated because I was a 'stupid Polack.'"

After this thirteen-day assignment was completed, Sergeant Newman prepared and submitted a field training summary outlining his observations of plaintiff. The summary was submitted to Deputy Chief of Police Ronald McClaskey on July 28, 1999. According to Chief Kath, based on this training summary, Olson's citizen complaint, and at least one other citizen complaint filed against plaintiff, the Command Staff determined that plaintiff had not met the standards required for service in the Arlington Heights Police Department.

On or about August 10, 1999, plaintiff met with Deputy Chief McClaskey and Commander Kinsey and was told that Chief Kath would recommend plaintiff's termination to the

6

Board of Commissioners. Plaintiff was given a copy of a letter to that effect that Chief Kath had prepared for the Board of Commissioners. According to defendants, this meeting was first time that Deputy Chief McClaskey learned of plaintiff's claim of harassment and discrimination.[3] Moreover, plaintiff has not produced any evidence that indicates that Chief Kath knew of plaintiff's discrimination allegations prior to preparing his letter recommending termination.

On August 19, 1999, plaintiff, along with his union representative and his union attorney, appeared before Carole Addante, the Director of Human Resources, and Robin Ward, the Assistant Village Attorney, and discussed plaintiff's claims of harassment. After an investigation, Addante and Ward concluded that Chief Kath's decision to terminate plaintiff was made for legitimate, non-discriminatory reasons. Plaintiff was terminated by the Board of Commissioners on August 30, 1999.

At his deposition, plaintiff testified that he did not have personal knowledge of Chief Kath telling anyone at the Carol Stream Police Department that they should not hire plaintiff after he was terminated. Nor has plaintiff produced any testimonial evidence from other individuals to that effect.

---

[3]Plaintiff disputes only the specific date of the meeting, which he acknowledges occurred after his tour with Sergeant Newman.

## **DISCUSSION**

A movant is entitled to summary judgment under Fed. R. Civ. P. 56 when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Becker v. Tenenbaum-Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

1.  Count I: Hostile Work Environment

As a preliminary matter, the court notes that "[i]t is only the employee's employer who may be held liable under Title VII." Robinson v. Sappington, 351 F.3d 317, 332, n.1 (7th Cir. 2003). Accordingly, defendants Kath, McClaskey, Kinsey, Martin, and Newman cannot be held individually liable under Counts I and II, and the court dismisses those claims against them, with prejudice.

"Title VII protects a worker against conduct which is sufficiently severe or pervasive that a reasonable person would find it hostile and which the victim himself subjectively sees as

8

abusive." Ngeunjuntr v. Metropolitan Life Ins. Co., 146 F.3d 464, 467 (7th Cir. 1998) (citing Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993)). "In order to survive summary judgment on a hostile work environment claim, a plaintiff must present evidence that would establish that the allegedly hostile conduct was so severe or pervasive as to create an abusive working environment in violation of Title VII." Robinson v. Sappington 351 F.3d 317, 329 (7th Cir. 2003) (quoting Russell v. Bd. of Trustees of the Univ. of Illinois at Chicago, 243 F.3d 336, 342-43 (7th Cir.2001)).

In evaluating whether a workplace is hostile or abusive, the court must look at all the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or merely an offensive utterance; and whether it unreasonably interferes with an employee's work performance. Harris, 510 U.S. at 23. In the context of sexual harassment, the Seventh Circuit has noted that "[i]t is not a bright line, obviously, this line between a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other...." Robinson, 351 F.3d at 329-330 (quoting Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430-431 (7th Cir. 1995)). Moreover, according to the Supreme Court, "[s]imple teasing, offhand comments, and isolated instances (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

With these standards in mind, it seems clear that no reasonable jury could conclude that Newman's, Martin's, and Kinsey's comments created an objectively hostile work environment. The statements, although offensive, were neither physically threatening nor humiliating; nor is there evidence that the comments affected plaintiff's ability to do his job. Moreover, without

9

condoning the cultural insensitivity displayed by the alleged remarks, the court notes that the nature of the comments was not sufficiently severe to invoke Title VII protection. At most, plaintiff's uncorroborated evidence would show that he was subjected to offhand, offensive remarks by Newman (and to a lesser extent by Kinsey and Martin) over a period of time not exceeding three months.[4]

Although the statements made by Newman, Kinsey, and Martin were arguably unpleasant, they do not rise to the level of actionable harassment. As the Seventh Circuit has noted, "The workplace that is actionable is the one that is 'hellish.'" Logan v. Kautex Textron North America, 259 F.3d 635, 641 (7th Cir. 2001) (quoting Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir.1997)). Defendant Village's motion for summary judgment on Count I is therefore granted.

2. Counts II and III: Intentional Discrimination under Title VII and Section 1981

Curiously, the Village's motion does not mention the standards applicable to plaintiff's claim of wrongful termination on the basis of his national origin. According to the Seventh Circuit, a plaintiff bringing a claim under Title VII can prove discrimination using either the "direct" method or the indirect, burden-shifting method outlined by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Cerutti v. BASF Corp., 349 F.3d

---

[4] Plaintiff's deposition testimony and affidavit are in conflict regarding the period of time during which those statements were made. Although for reasons discussed infra, the court concludes that it must disregard plaintiff's statement in his affidavit that the harassment continued through his termination, it is worth noting that, at most, plaintiff claims it was for the three-month period of time between the investigation of the Olson incident and his termination.

1055, 1060-1061 (7th Cir. 2003). The same standards apply to claims brought under Section 1981. Gonzalez v. Ingersoll Mill. Mach. Co., 133 F.3d 1025, 1035 (7th Cir. 1998).

Under the direct method of proof, a plaintiff may show, by way of direct or circumstantial evidence, that his employer's decision to take an adverse job action against him was motivated by an impermissible purpose, such as race, national origin, or age. Id. at 1061. Direct evidence is "evidence which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption." Cowan v. Glenbrook Sec. Services, Inc., 123 F.3d 438, 443 (7th Cir. 1997) (quoting Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 347 (7th Cir. 1997)). Put differently, "[d]irect evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." Cerutti, 349 F.3d at 1061 (quoting Rogers v. City of Chicago, 320 F.3d 748, 753 (7th Cir. 2003)). "A plaintiff can also prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker.'" Cerutti, 349 F.3d at 1061 (quoting Rogers, 320 F.3d at 753).

To establish his prima facie case of discrimination under the indirect method, plaintiff must show that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) other similarly-situated employees who were not members of the class were treated more favorably. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973); Wells v. Unisource Worldwide, Inc., 289 F.3d 1001, 1006 (7th Cir. 2002). Once plaintiff has established a prima facie case of discrimination, the employer must then produce evidence of a legitimate, non-discriminatory reason for the adverse employment action. Id. If the employer proffers such a

11

reason, the burden then shifts back to the plaintiff to demonstrate that the employer's proffered reason is a pretext. Id.

Rather than proceeding under either or both of these methods, plaintiff submits that Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), abrogated the direct/indirect evidence distinction and overruled McDonnell Douglas. See also Dare v. Wal-Mart Stores, Inc., 267 F. Supp. 2d 987, 990 (D. Minn. 2003). Having reviewed Desert Palace, and in the absence of binding authority to the contrary, the court declines to adopt the Dare court's analysis and concludes that McDonnell Douglas remains a viable framework for evaluating summary judgment motions. The holding of Desert Palace, that a plaintiff need not present direct evidence of discrimination to obtain a mixed-motive instruction under 42 U.S.C. 2000e-2(m), does not run counter to the McDonnell Douglas framework or this circuit's interpretation of it.

With this in mind, the court concludes that plaintiff has not met his burden under either the direct method or the McDonnell Douglas framework. There is no evidence, circumstantial or otherwise, that the alleged comments regarding plaintiff being a "dumb Polack" were directly related to plaintiff's ultimate termination. Stray workplace comments unrelated to an alleged discriminatory employment decision are not sufficient to support an inference of discrimination. Schreiner v. Caterpillar, Inc., 250 F.3d 1096, 1099 (7th Cir. 2001). Although the statements at issue were arguably made around the time of plaintiff's termination, they were not made in reference to the decision to terminate. See Gorence v. Eagle Food Centers, Inc., 242 F.3d 759, 962 (7th Cir. 2001) (explaining that remarks made around the time of adverse employment decision, and made in reference to that decision, may not be "stray" remarks at all).

12

Plaintiff claims that Sergeant Newman made most of the offensive remarks at issue, and that his report played into Chief Kath's decision to fire plaintiff. These facts notwithstanding, there is simply no evidence that Newman's reports, which were signed by plaintiff, were inaccurate or otherwise unworthy of credence. Moreover, Chief Kath's decision to fire plaintiff was based not only on Sergeant Newman's report, but also took into account multiple citizen complaints that had been filed against plaintiff.

Plaintiff's assertion in his affidavit that Sergeant Newman continued to harass him even after their thirteen day ride-along period had concluded does not compel a different result. In his affidavit, plaintiff states:

> On almost a daily basis [after completing my training with Sergeant Newman], Sergeant Newman would call me in from patrol to tell me personally that the written evaluations he made of me during my training were handed over to Deputy Chief Ronald McClaskey and that I would be terminated because I was a "stupid Polack."

This statement must be disregarded because it conflicts with plaintiff's deposition, in which he testified that he did not recall other ethnic slurs directed at him after completing his training with Sergeant Newman. "Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken." Russell v. Acme-Evans Co., 51 F.3d 64, 67-68 (7th Cir. 1995). See also Adusumilli v. City of Chicago, 164 F.3d 353, 360 (7th Cir. 1998) (holding that deposition testimony that plaintiff could not recall any incidents of harassment and subsequent affidavit claiming daily harassment were in conflict).

Nor is there credible evidence that Sergeant Newman was appointed to supplement plaintiff's training as the result of a conspiracy among other officers to ensure plaintiff's

13

termination. The only evidence offered by plaintiff on this point is his affidavit in which he claims that "it was made clear that the purpose of Sergeant Newman's assignment to ride-along with me was to either get me to resign or to document a reason justifying my termination." These conclusory allegations, without more, are insufficient to create an inference of discrimination in the instant case. See Hall v. Bodine Elec. Co., 276 F.3d 345, 354 (7th Cir. 2002) ("It is well settled that conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact.").

Plaintiff also emphasizes repeatedly that Sergeant Newman was not a field training officer, presumably to buttress his argument that Sergeant Newman was selected solely to ensure plaintiff's termination. This argument is unavailing, however, in light of Chief Kath's unrefuted statement in his affidavit that there is no general order or requirement that further training beyond the fourteen week field training program must be conducted by a field training officer, and Commander Kinsey's deposition testimony to that effect. That Commander Kinsey may have voiced his concerns regarding plaintiff's performance to Sergeant Newman does not dictate a different result; this fact alone is insufficient to raise an inference that Kinsey and Newman somehow conspired to have plaintiff terminated on the basis of his national origin. The court thus concludes that plaintiff has failed to prove a case under the direct method of proof described herein.

Nor does plaintiff fare better under the indirect method. Aside from uncorroborated statements by plaintiff, plaintiff has not produced any evidence - testimonial, statistical or otherwise - that similarly situated employees who were not of Polish descent were treated more favorably than he. Indeed, the record establishes that there are a number of officers on the

14

Village police force of Polish ancestry, including Galinski (who is Polish and German) and Rohde (who is three-quarters Polish). Consequently, plaintiff fails to meet the fourth element of his prima facie case.

Even assuming <u>arguendo</u> that plaintiff did establish a <u>prima facie</u> case, he still would not prevail in the instant dispute. His employer has articulated a legitimate, non-discriminatory reason for his discharge: that he was the subject of numerous citizen complaints and otherwise was not meeting their expectations.

Notwithstanding his representations to the contrary, plaintiff has not produced evidence refuting Martin and Galinski's conclusions regarding their investigation of the Olson complaint (specifically, that plaintiff's confusion between two charges led him to mistakenly handcuff and take custody of a man who was ultimately charged with a relatively minor traffic offense). Nor does plaintiff dispute that another citizen, Piquette, filed a complaint against him. In fact, the evidence suggests that the ultimate decisionmaker, Chief Kath, was not aware of the allegations of discrimination until after making his recommendation to terminate plaintiff, and there is no evidence that Chief Kath himself harbored any animus toward plaintiff on the basis of his national origin. Put simply, plaintiff has not produced evidence that his employer's stated reason for terminating him was pretext, and no reasonable jury could conclude otherwise.

Because plaintiff has failed to prove a case of intentional discrimination under either the direct or indirect method of proof, the court grants defendants' motion for summary judgment with respect to Count II. Moreover, because the same standards governing liability under Title

VII apply to Section 1981, Gonzalez v. Ingersoll Mill. Mach. Co., 133 F.3d 1025, 1035 (7th Cir. 1998), defendants' motion for summary judgment is granted with respect to Count III, as well.

3.   Count IV: Labor Management Relations Act

29 U.S.C. § 152(2) provides that the term "employer," as used in the LMRA, shall not include "any State or political subdivision thereof." The general test for determining whether an employer is an exempt political subdivision is whether or not it was, (1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate. N.L.R.B. v. Parents and Friends of the Specialized Living Center, 879 F.2d 1442, 1448 (7th Cir. 1989) (quoting NLRB v. Natural Gas Util. Dist. of Hawkins County, 402 U.S. 600, 604-05 (1971)).

Defendants assert that the Village and the Board of Commissioners qualify as political subdivisions of the State of Illinois and thus are exempt under the LMRA. Plaintiff has failed to respond to this argument, which appears to be meritorious. The court therefore dismisses Count IV with prejudice.

4.   Count V: Intentional Interference with Employment Relationship

In his response to defendants' motion for summary judgment, plaintiff does not defend, much less mention, Count V of his first amended complaint. In that count, plaintiff seeks damages from Kath, Kinsey, Martin and McClaskey in connection with their authorization of plaintiff's termination, which he characterizes as intentional interference with his employment relationship with the Village.

Defendants suggest that they should prevail on Count V because plaintiff has not produced evidence that Kath spoke with anyone in the Carol Stream Police Department. As explained below, that criticism is more properly leveled against Counts VI and VII.

That does not save Count V, however. Other courts in this district have noted that claims for intentional interference with an employment relationship are typically inapplicable to the employer or agent who actually terminates the employee. See, e.g., Mustafa v. Illinois Dept. of Public Aid, 1997 WL 194980, at *5 (N.D.Ill. March 14, 1997). Similarly, in Fuller v. Chicago College of Osteopathic Medicine, 719 F.2d 1326, 1333 (7th Cir. 1983), the Seventh Circuit recognized a limited "corporate privilege" for corporate officers acting on behalf of their corporations:

> Corporate officers are not outsiders intermeddling maliciously in the business affairs of the corporation. They are privileged to act on behalf of their corporations, using their business judgment and discretion.... However, when the action is detrimental to the corporation and outside the scope of corporate authority, immunity ceases to exist.

Supervisors and co-workers are also protected by this corporate privilege. See Naeemullah v. Citicorp Services, Inc., 78 F. Supp. 2d 783, 793 (N.D.Ill. 1999); Mustafa, 1997 WL 194980, at *5.

There is no evidence that defendants in the instant case acted in a manner that was detrimental to the Village Police Department, or otherwise acted outside the scope of their corporate authority. Accordingly, the court grants defendants' motion for summary judgment on Count V.

17

5. Counts VI and VII: Interference with Prospective Business Advantage and Defamation

Plaintiff bases Counts VI and VII of the first amended complaint on the allegation that Chief Kath discouraged the Village of Carol Stream from hiring plaintiff. As defendants point out, however, plaintiff acknowledged in his deposition that he had no actual knowledge of any conversations between Chief Kath and the Village of Carol Stream, or any other contacts between the Village of Carol Stream and any other official of the Village. Plaintiff does not refute or otherwise respond to defendants' argument, apparently conceding that no triable issue of fact exists with respect to Counts VI and VII. The court thus grants defendants' motion for summary judgment on these counts.

## CONCLUSION

For the reasons stated herein, defendants' motion for summary judgment is granted in its entirety.

**ENTER:** **March 24, 2004**

**Robert W. Gettleman**
**United States District Judge**